# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| DARAN JOSHI, Derivatively on Behalf of Nominal Defendant DOMINO'S PIZZA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| C. ANDREW BALLARD, ANDREW B. BALSON, CORIE S. BARRY, DAVID A. BRANDON, DIANA F. CANTOR, RICHARD L. FEDERICO, JAMES A. GOLDMAN, PATRICIA E. LOPEZ, SANDEEP REDDY, AND RUSSELL WEINER, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) | |
| and | ) ) | |
| DOMINO'S PIZZA, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Daran Joshi ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Domino's Pizza, Inc. ("Domino's Pizza" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange

Commission ("SEC") filings, press releases published by and regarding Domino's Pizza, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Domino's Pizza against certain officers and members of the Company's Board for breaches of their fiduciary duties and other violations of law from December 7, 2023 through July 17, 2024, inclusive (the "Relevant Period"), as set forth below.

2. Domino's Pizza describes itself as the largest pizza company in the world, with a significant business in both delivery and carryout.

3. The Company ranks among the world's top public restaurant brands with a global enterprise of more than 21,300 stores in over ninety markets.

4. Domino's Pizza had global retail sales of over $19.1 billion in 2024.

5. The Company's system is comprised of independent franchise owners who accounted for ninety-nine percent of Domino's Pizza's stores as of the end of the fourth quarter of 2024.

6. In the United States, Domino's Pizza generated more than eighty-five percent of U.S. retail sales in 2024 via digital channels and has developed many innovative ordering platforms.

7. On December 7, 2023, the Company hosted its 2023 "Investor Day."

8. During the Investor Day, the Individual Defendants caused Domino's Pizza to provide updated long-term guidance of "1,100+" annual global net store growth for 2024 through 2028.

9.    On July 18, 2024, the Individual Defendants caused the Company to issue a press release, wherein Domino's Pizza announced its financial results for the 2024 second quarter.

10.    The Company announced that that it "expects it will fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises ('DPE'), one of its master franchisees."

11.    As a result, the press release stated that "[t]he Company is temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net store growth are known."

12.    A corresponding earnings conference call was held, during which Individual Defendant Sandeep Reddy ("Reddy"), Domino's Pizza's Chief Financial Officer ("CFO"), disclosed that the long-term guidance announced during the Company's 2023 Investor Day did not accurately portray the extent of DPE's challenges regarding closures of stores and new store openings.

13.    Following this news, the Company's share price dropped 13.57 percent, or by $64.23 per share, to close at $409.04 per share on July 18, 2024.

14.    As a result of the foregoing and as set forth in greater detail herein, a securities fraud class action was filed against the Company, captioned *Bender v. Domino's Pizza, Inc.*, Case No. 2:24-cv-12477 (E.D. Mich.) (the "Securities Class Action").

15.    The Securities Class Action has caused, and will continue to cause, Domino's Pizza to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

17.     Plaintiff's claims also raise a federal question regarding the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and the Securities Class Action is pending in this District.

## PARTIES

### *Plaintiff*

23.     Plaintiff is, and has been at all relevant times, a shareholder of Domino's Pizza.

Plaintiff is a citizen of New Malden, Surrey, London.

***Nominal Defendant***

24.     Nominal Defendant Domino's Pizza is a Delaware corporation with its principal executive offices located at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan 48105. Domino's Pizza's common stock trades on the NYSE under the ticker symbol "DPZ."

***Individual Defendants***

25.     Defendant C. Andrew Ballard ("Ballard") has served as a member of the Board of Domino's Pizza since 2015. Ballard serves as a member of the Compensation and Human Capital Committee. Upon information and belief, Ballard is a citizen of California.

26.     Defendant Andrew B. Balson ("Balson") has served as a member of the Board of Domino's Pizza since 1999. Balson serves as a member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee. Upon information and belief, Balson is a citizen of Massachusetts.

27.     Defendant Corie S. Barry ("Barry") has served as a member of the Board of Domino's Pizza since 2018. Barry serves as Chairperson of the Compensation and Human Capital Committee. Upon information and belief, Barry is a citizen of Minnesota.

28.     Defendant David A. Brandon ("Brandon") is the Executive Chairman of the Board and has served as a member of the Board of Domino's Pizza since 1999. Upon information and belief, Brandon is a citizen of Michigan.

29.     Defendant Diana F. Cantor ("Cantor") has served as a member of the Board of Domino's Pizza since 2005. Cantor serves as a member of the Nominating and Corporate Governance Committee. Upon information and belief, Cantor is a citizen of Virginia.

30.     Defendant Richard L. Federico ("Federico") has served as a member of the Board of Domino's Pizza since 2011. Federico serves as Chairperson of the Audit Committee. Upon information and belief, Federico is a citizen of Arizona.

31.     Defendant James A. Goldman ("Goldman") has served as a member of the Board of Domino's Pizza since 2010. Goldman serves as a member of the Audit Committee. Upon information and belief, Goldman is a citizen of New York.

32.     Defendant Patricia E. Lopez ("Lopez") has served as a member of the Board of Domino's Pizza since 2018. Lopez serves as Chairperson of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Upon information and belief, Lopez is a citizen of New York.

33.     Defendant Reddy has served as CFO of Domino's Pizza since 2022. Upon information and belief, Reddy is a citizen of Michigan.

34.     Defendant Russell Weiner ("Weiner") has served as Chief Executive Officer ("CEO") and a member of the Board of Domino's Pizza since 2022. Upon information and belief, Weiner is a citizen of Michigan.

35.     Defendants referenced in paragraphs 25 through 34 are herein referred to as the "Individual Defendants."

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

36.     By reason of their positions as officers and/or directors of Domino's Pizza, and because of their ability to control the business and corporate affairs of Domino's Pizza, the Individual Defendants owed Domino's Pizza and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Domino's Pizza in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Domino's Pizza and

its shareholders.

37.     Each director and officer of the Company owes to Domino's Pizza and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Domino's Pizza, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of Domino's Pizza were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Domino's Pizza, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42.     To discharge their duties, the officers and directors of Domino's Pizza were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Domino's Pizza were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Domino's Pizza's own Code of Business Conduct and Ethics for Directors, Officers, and Employees (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how Domino's Pizza conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Domino's Pizza and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Domino's Pizza's operations would comply with all applicable laws and Domino's Pizza's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)   Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

43.     Each of the Individual Defendants further owed to Domino's Pizza and the shareholders the duty of loyalty requiring that each favor Domino's Pizza's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

44.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Domino's Pizza and were at all times acting within the course and scope of such agency.

45.     Because of their advisory, executive, managerial, and directorial positions with Domino's Pizza, each of the Individual Defendants had access to adverse, non-public information about the Company.

46.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Domino's Pizza.

## DOMINO'S PIZZA'S CODE OF CONDUCT

47.     Domino's Pizza's Code of Conduct provides:

The stockholders, team members, customers, vendors and other business partners of Domino's Pizza, Inc. (the "Company") rely on the honesty and integrity of the Company's Board of Directors. To support this trust, the Directors, officers and employees of the Company must commit themselves to the following Code of Business Conduct and Ethics for Directors, Officers and Employees (this "Code").

48.     The Code of Conduct further states:

Compliance with Laws, Rules and Regulations. The Company requires strict compliance by its Directors, officers and employees with applicable laws, rules and regulations, including insider trading laws. Pursuant to the Company's Insider Trading Policy, the Company prohibits its Directors, officers and employees from trading, either personally or on behalf of others, in securities on the basis of material non-public information. The Company also prohibits Directors, officers and employees from communicating material, non-public information to others so they may trade in securities on the basis of that information.

49.     The Code of Conduct continues:

Full and Fair Disclosure. The Company is committed to full compliance with all requirements applicable to its public disclosures, including reports filed or furnished to securities regulators. All of the Company's business communications should be timely, clear and accurate. It is a violation of this Code to misrepresent the Company's financial performance or otherwise compromise the integrity of its financial statements or other disclosures.

50.     Moreover, the Code of Conduct provides:

Reporting Illegal or Unethical Behavior. Directors, officers and employees should communicate any suspected violations of laws, rules, regulations or this Code to the Chair of the Nominating and Corporate Governance Committee or the Chair of

the Board of Directors. The Company will not allow retaliation for any such reports that are made in good faith. The Company is committed to prompt, consistent and appropriate enforcement of this Code and is committed to taking appropriate enforcement action as designed to maintain compliance with this Code and with all applicable laws, rules and regulations.

## DOMINO'S PIZZA'S AUDIT COMMITTEE CHARTER

51.    Domino's Pizza's Audit Committee is governed by its Audit Committee Charter.

52.    As set forth in the Audit Committee Charter:

Purpose. The Audit Committee (the "Audit Committee") of the Board of Directors of Domino's Pizza, Inc. (the "Company") shall: (a) appoint, replace and oversee the Company's independent auditor; (b) oversee the internal and external audit process, including the scope and implementation of the annual audit; (c) assist the Board of Directors in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the performance of the Company's internal audit function and the adequacy of the Company's system of internal controls, (iv) the independent auditor's qualifications, independence and performance, and (v) compliance with the Company's Code of Business Conduct and Ethics for Directors, Officers and Employees and Code of Professional Conduct for Senior Financial Officers; and (d) prepare the audit committee report that the Securities and Exchange Commission (the "SEC") rules require to be included in the Company's annual proxy statement.

53.    The Audit Committee Charter further provides, in a section titled "Responsibilities and Powers of the Audit Committee":

The responsibilities and powers of the Audit Committee are as follows: . . .

C. Oversight of Financial Statements

(1) Review and discuss with management, the internal audit group and the independent auditor the Company's system of internal control over financial reporting and its accounting practices. Resolve any disagreements, if any, between management and the independent auditor. . . .

(4) Review with management and the independent auditor the annual and quarterly financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q before filing with the SEC. Review with management the remaining portions of the Form 10-K and each Form 10-Q and any other document filed with the SEC and distributed to stockholders prior to filing or distribution.

(5) Discuss the results of the annual audit and quarterly reviews and any other matters required to be communicated to the Audit Committee by the independent auditor under generally accepted auditing standards and PCAOB Auditing Standard 16, and management's response to any problems or difficulties.

(6) Review and discuss the types of financial information to be included in earnings press releases and in earnings guidance, if any, provided to stockholders, analysts and rating agencies.

(7) Review pending legal proceedings and other known contingent liabilities that are communicated by management to the Audit Committee as potentially having a material effect on the Company's financial statements. . . .

F. Risk Assessment

(1) Assess, review, evaluate and discuss with management the Company's risk assessment and risk management policies and program.

(2) Receive a presentation from management/internal auditor on the Company's annual risk assessment and review risk management items as necessary with management or the internal audit director, as applicable.

(3) Receive periodic updates from management and the information security team relating to the Company's information systems security.

G. Oversight of the Company's Compliance Program

(1) Review the process of communicating the Company's Code of Business Conduct and Ethics to team members and the Code of Professional Ethics for Senior Financial Officers to finance team members and the process for overseeing team member compliance and procedures for the receipt, retention and treatment of complaints relating thereto.

(2) Review compliance with and the process of assuring the Company's compliance with laws and regulations, including, but not limited to, applicable Nasdaq Stock Market listing standards, SEC rules and regulations, the Foreign Corrupt Practices Act, the Sarbanes-Oxley Act of 2002 and the Dodd-Frank Wall Street Reform and Consumer Protection Act.

H. General Responsibilities

(1) Report regularly to the Board of Directors.

(2) Review the adequacy of this Charter annually and submit any proposed amendments to the Board of Directors for approval.

(3) Conduct and present to the Board of Directors an annual evaluation of the performance of the Audit Committee.

(4) Prepare such reports as required by SEC rules.

(5) Perform any other activities consistent with this Charter, the Company's Certificate of Incorporation and By-laws and governing law as the Board of Directors or the Audit Committee shall deem appropriate. . . .

VII. Other Areas of Review. The Audit Committee will review other areas, as it deems necessary, including:

A. Employee Benefit Plans. The Audit Committee shall review with the independent auditor of the Company's employee benefit and retirement plans (the "Benefit Plans Independent Auditor") and management the results of the Benefit Plans Independent Auditor's annual audit of the Company's employee benefit plans.

B. 401(k) Plan. The Audit Committee shall review the results of the Benefit Plans Independent Auditor's annual audit of the Company's 401(k) plan and receive a report from management on management's process to ensure the 401(k) plan is in compliance with applicable laws, rules and regulations.

C. Tax Returns. The Audit Committee shall review with management and the Company's tax advisors the status of tax returns, including open years and potential disputes, and it shall review with the independent auditor the adequacy of tax reserves included in the Company's financial statements.

D. Fraudulent or Illegal Activities. The Audit Committee shall review the circumstances of any fraudulent or illegal activities that may be discovered, and any preventative action taken in response to such activities. It shall initiate an investigation of any special situation, if warranted.

E. CEO Expenses. The Audit Committee shall review and approve the expenses of the CEO at least annually.

## SUBSTANTIVE ALLEGATIONS

**Background**

54.     Domino's Pizza describes itself as the largest pizza company in the world, with a significant business in both delivery and carryout.

55.     The Company ranks among the world's top public restaurant brands with a global enterprise of more than 21,300 stores in over ninety markets.

56.     Domino's Pizza had global retail sales of over $19.1 billion in 2024.

57.     The Company's system is comprised of independent franchise owners who accounted for ninety-nine percent of Domino's Pizza's stores as of the end of the fourth quarter of 2024.

58.     In the United States, Domino's Pizza's generated more than eighty-five percent of U.S. retail sales in 2024 via digital channels and has developed many innovative ordering platforms.

**Materially False and Misleading Statements**

59.     On December 7, 2023, Domino's Pizza held its 2023 Investor Day.

60.     During the 2023 Investor Day, the Individual Defendants disclosed updated long-term guidance of "1,100+" annual global net store growth for the 2024 through 2028.

61.     On February 26, 2024, the Individual Defendants caused the Company to issue a press release, wherein Domino's Pizza announced its financial results for the 2023 fourth quarter and fiscal year.

62.     In the press release, Individual Defendant Weiner commented: "Our strong fourth quarter demonstrates that our Hungry for MORE strategy is already delivering results. This strategy, which we recently unveiled at our Investor Day, is our plan to deliver MORE sales, MORE stores and MORE profits."

63.     Weiner continued: "Domino's foundation has never been stronger. Our positive U.S. transactions and same store sales growth in both our delivery and carryout channels in the fourth quarter underscore the strength and momentum in our business. These results give us

14

confidence in our brand and the Company's ability to win and create meaningful value for our shareholders."

64.  Moreover, the press release provided:

Long-Term Guidance (2024 – 2028)

The Company hosted its Investor Day on December 7, 2023, and announced the following long-term guidance metrics that the Company continues to expect to achieve. Annual global retail sales growth and annual income from operations growth exclude the impact of foreign currency.

- 7%+ Annual global retail sales growth;
- 1,100+ Annual global net store growth;
- 8%+ Annual income from operations growth.

65.  Also on February 26, 2024, the Individual Defendants caused the Company to file a Form 10-K with the SEC (the "Annual Report"), which announced Domino's Pizza's 2023 fiscal year financial results. The Annual Report provided:

U.S. Franchise Profile

As of December 31, 2023, our network of 6,566 U.S. franchise stores was owned and operated by 735 independent U.S. franchisees. Our franchise formula enables franchisees to benefit from our brand recognition with a relatively low initial capital investment. As of December 31, 2023, the average U.S. franchisee owned and operated approximately nine stores and had been in our franchise system for over 17 years. Additionally, 22 of our U.S. franchisees operated more than 50 stores (including our largest U.S. franchisee who operated 143 stores) and 209 of our U.S. franchisees each operated one store as of December 31, 2023.

We apply rigorous standards to prospective U.S. franchisees. We generally require them to manage a store for at least one year and graduate from our franchise management school program before being granted the right to franchise. This enables us to observe the operational and financial performance of a potential franchisee prior to entering into a long-term agreement. Substantially all of our independent U.S. franchise owners started their careers with us as delivery drivers or in other in-store positions, which we believe offers advantages in terms of familiarity with our business and store operations. In addition, we generally restrict the ability of U.S. franchisees to be involved in other businesses, which we believe helps focus our franchisees' attention on operating their stores. We believe these characteristics and standards are largely unique within the franchise industry and have resulted in qualified and focused franchisees operating Domino's stores. We

maintain a productive relationship with our independent franchise owners through regional franchise teams, distributing materials that help franchise stores comply with our standards and using franchise advisory groups that facilitate communications between us and our franchisees. We consider our relationship with our U.S. franchisees to be good.

66.     Moreover, the Annual Report stated:

**Strong and Proven Business Model**

Our business model generates U.S. and international franchise royalties and fees, supply chain revenues and retail sales at Company-owned stores. We have developed this model over our many years of operation, and it is anchored by strong store-level economics, which provide an entrepreneurial incentive for our franchisees and historically has generated strong demand for new stores. Over the past ten years, average U.S. store profitability in the Domino's system has increased meaningfully, resulting in higher profitability for our franchise owners. Our franchise system, in turn, has produced strong and consistent earnings for us through royalty and fee payments and through supply chain gross margins.

We developed a cost-efficient store model, characterized by a delivery and carryout-oriented store design, with moderate capital requirements and a menu of quality, value-oriented and affordable items. At the store level, we believe the simplicity and efficiency of our operations give us significant advantages over our competitors, who, in many cases, also focus on dine-in or have broader menu offerings. At the supply chain level, we believe we provide quality, good value and consistency for our franchise customers while also driving profits for us, which we share with our franchisees under the profit-sharing arrangements described above. . . .

67.     The Annual Report continued:

We believe our store financial returns have led to a strong, well-diversified franchise system. This established franchise system has produced strong cash flows and earnings for us, enabling us to invest in the Domino's brand, stores, technology and supply chain centers, pay dividends, repurchase and retire shares of our common stock and service our debt obligations.

68.     A corresponding earnings conference call was held, during which Individual Defendant Weiner commented:

Our strong Q4 demonstrated that our Hungry for MORE strategy is already delivering results. Our positive U.S. same-store sales and transaction growth in both delivery and carryout underscore the strength and momentum that we're building in our business. These results and the initiatives that I'll cover today give me

16

confidence in Domino's ability to continue to drive meaningful value for shareholders.

We're excited to share an update on the business through the lens of our Hungry for MORE strategy. Now as a reminder, Hungry for MORE is our new strategy around what we're going to do to deliver over the course of the next five years, more sales, more stores and more profits. . . .

69.      Weiner continued:

We ended 2023 slightly ahead of our expectations on U.S. store growth and profits, adding 168 net new stores and finishing the year with estimated average franchisee profitability per store of $162,000. This highlights the momentum we expect to continue into 2024. I couldn't be more excited about 2024 and beyond for Domino's Pizza. Our foundation has never been stronger and our vision has never been greater. We made a ton of progress in 2023 and our strong start to '24 gives me confidence in our ability to win with customers and drive return for Domino's franchisees and shareholders.

70.      Furthermore, Individual Defendant Reddy commented:

Now shifting to net stores, where we are expecting 1,100 or more, which will be driven by 175 in the U.S. and 925 in international. There was a meaningful uptick in our U.S. net store growth in the fourth quarter, which was slightly ahead of our expectations, and the pipeline continues to build. We are expecting net unit growth in the U.S. to be relatively flat to 2023 in the first half of the year and to accelerate slightly in the back half based on current visibility.

71.      In response to questions from analysts during the conference call, Weiner stated:

[Analyst]: . . . As you guys look out to next year, can you maybe talk about your confidence in that accelerating on a global basis next year and then maybe what that looks like from a domestic and international standpoint?

[Weiner]: Yeah. We still feel really strongly about the guidance we gave, the 1,100 plus stores and 5,500 over the next five years. I mean you saw some really nice momentum at the end of the year in the U.S. in 2023. We expect to see more at the end of the year in 2024. Internationally, I think we've got a lot of closures behind us, that was probably one of the things that was driving down the number this year. But those closures really focused on three areas. Domino's Pizza Enterprises, and they talked about their number, Russia and Brazil. . . .

72.      On April 29, 2024, the Individual Defendants caused the Company to issue a press release, wherein Domino's Pizza announced its financial results for the 2024 first quarter.

73. In the press release, Individual Defendant Weiner commented: "Our first quarter results demonstrated that our Hungry for MORE strategy is off to a strong start: delivering MORE sales, MORE stores, and MORE profits."

74. Weiner continued:

The Renowned Value we created through our new and improved Domino's Rewards loyalty program drove outsized comp performance, which flowed through to the bottom line with double-digit profit growth.

Importantly, our growth in the U.S. came through positive order counts in both our carryout and delivery businesses for the second quarter in a row. Further, this order growth was across all income cohorts. In Q1 we also went live with marketing on Uber Eats, and we remain on track to exit the year at 3% or MORE of sales coming through this new channel. We are laser focused on driving franchisee profitability and store growth, which will fuel the Company's ability to win and create meaningful long-term value for our shareholders.

75. The press release went on to state:

Long-Term Guidance (2024 – 2028)

The Company continues to expect to achieve the following long-term guidance metrics previously announced. Annual global retail sales growth and annual income from operations growth exclude the impact of foreign currency.

- 7%+ Annual global retail sales growth;
- 1,100+ Annual global net store growth; and
- 8%+ Annual income from operations growth

76. A corresponding earnings conference call was held, during which Individual Defendant Weiner commented:

Our Q1 results demonstrated that our Hungry for MORE strategy is delivering on its promise, driving more sales, more stores and more profit. We drove strong comp performance in the U.S. that flowed through to the bottom-line with double-digit profit growth. And our growth in the U.S. came through positive order counts across all income cohorts in both our carryout and delivery segments. We saw the largest growth in our lower-income cohorts that are undoubtedly benefiting from the renowned value that we're offering.

77. Moreover, according to Weiner:

Everything we do at Domino's is enhanced by our best-in-class franchisees, the E in our Hungry for MORE strategy. We'll be hosting thousands of franchisees for our worldwide rally in May, where we plan to bring our Hungry for MORE strategy to life across our global system. I can't wait for that gathering as our franchisees are what makes Domino's so special. They were the inspiration behind Hungry for MORE.

So to close, I couldn't be more excited about 2024 and beyond for Domino's Pizza. Our first quarter results clearly show that our strategy is resonating with customers. This gives me great confidence that, we can deliver against our short- and long-term Hungry for MORE goals and drive significant value creation for our shareholders.

**The Truth Emerges**

78.     On July 18, 2024, the Individual Defendants caused Domino's Pizza to issue a press release, wherein the Company announced its financial results for the 2024 second quarter.

79.     As set forth in the press release:

Long-Term Guidance (2024 - 2028)

The Company continues to expect the following guidance metrics. Annual global retail sales growth and annual income from operations growth exclude the impact of foreign currency.

• 7%+ Annual global retail sales growth; and
• 8%+ Annual income from operations growth.

The Company now expects the following on annual global net store growth:

• Global net store growth of 825 to 925 in 2024.

• U.S.: The Company continues to expect 175+ net stores annually for 2024 to 2028.

• International: The Company expects it will fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises ("DPE"), one of its master franchisees. The Company is partnering closely with DPE as they work through this process and will provide further updates once it has more visibility into the effect on its annual global net store growth numbers.

- The Company is temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net store growth are known.

80.     A corresponding earnings conference call was held, during which Individual Defendant Reddy commented:

> And so I think when you go back to the Investor Day back in December, I think one of the process that we went through was working with all of our master franchisees, including DPE, on the expectations that they had for the business. And we basically calibrated to that for both 2024 and the five-year horizon as well. And at that time, we were completely aligned. So then actually we got into the end of the Q1 call and then we got into the second quarter and we started seeing that relative to our expectations and cadence, both new store openings as well as closures, really started increasing from DPE.

> And as we saw that, we continued to engage with the DPE team to validate the forecast that we had for the year. And it became pretty clear as we actually went through that conversation and discussion that there was not only the risk to the second quarter that we were seeing, but clearly the outlook was going to be impacted as well. And in fact, just yesterday I think DPE put out a release with a number of closures that they outlined in the Japan and France market in particular, which they're targeting for their first half, which is our second half, which therefore will land in this fiscal year. So apart from what we've seen in second quarter, we expect to see more pressure in the second half of this year.

81.     Following the conference call, on July 18, 2024, Bloomberg News published an article titled "Domino's Falls Most Since 2012 After Pulling Store-Growth Target."

82.     The article quoted an analyst from Citigroup Inc. as stating: "This unexpected update will shake investor confidence in the company's broader guidance and put pressure [on the stock]."

83.     The same day, Reuters published an article titled "Domino's Pizza warns of slower Q3 sales; shares fall," which quoted a Northcoast Research analyst as stating: "The market is anxious about risk going forward that this type of headwind will spread to more markets beyond Japan and France[.]"

84. Following this news, the Company's share price dropped 13.57 percent, or by $64.23 per share, to close at $409.04 per share on July 18, 2024.

**Insider Sales**

85. During the Relevant Period, while the Company's stock price was artificially inflated, Individual Defendant Weiner engaged in improper insider sales, netting total proceeds of more than $12.8 million.

86. Specifically, between December 7, 2023 – when the Individual Defendants provided updated long-term guidance of "1,100+" annual global net store growth for 2024 through 2028 – and the July 18, 2024 press release disclosing that the Company would not meet that guidance, Individual Defendant Weiner sold 27,740 shares of common stock.

**The Securities Class Action**

87. As a result of the foregoing, the Securities Class Action was filed against the Company, Reddy, and Weiner, captioned *Bender v. Domino's Pizza, Inc.*, Case No. 2:24-cv-12477 (E.D. Mich.).

88. As a result, Domino's Pizza has incurred, and will continue to incur, substantial costs to defend itself in the Securities Class Action, and is exposed to massive potential class-wide liability.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

89. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

90. Domino's Pizza is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

91.     Plaintiff is a current shareholder of Domino's Pizza and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

92.     A pre-suit demand on the Board of Domino's Pizza is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Ballard, Balson, Barry, Brandon, Cantor, Federico, Goldman, Lopez, and Weiner.

93.     Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

94.     The Individual Defendants either knew, or should have known, that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but they took no steps in a good faith effort to prevent or remedy that situation.

95.     Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

96.     Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

97.     Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

98.     Individual Defendants Federico, Goldman, and Lopez are not disinterested or independent.  Federico, Goldman, and Lopez are members of the Audit Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements.  Therefore, Federico, Goldman, and Lopez knowingly or recklessly allowed the issuance of the aforementioned improper statements.

99.     Defendants Balson, Cantor, and Lopez are not disinterested or independent.  Balson, Cantor, and Lopez are members of the Nominating and Corporate Governance Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company.  Defendants Balson, Cantor, and Lopez failed to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above.

100.     Individual Defendant Weiner is not disinterested or independent.  Weiner is CEO of the Company, and he derives substantial compensation from his relationship with the Company.  As alleged above, Weiner was directly involved in and perpetrated the scheme alleged herein.  In addition, Weiner engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of over $12.8 million. Moreover, Weiner was named as a defendant and, therefore, faces a substantial likelihood of liability, in the Securities

Class Action based on substantially the same wrongdoing alleged herein. Thus, Weiner is not disinterested or independent.

101.     Accordingly, a pre-suit demand on the Board is futile and, therefore, excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

102.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

104.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

105.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

107.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

110.    Plaintiff, on behalf of Domino's Pizza, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Domino's Pizza.

113.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Domino's Pizza that was tied to the performance or artificially inflated valuation of Domino's Pizza, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

114.    Moreover, as alleged herein, Weiner engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of over $12.8 million.

115.    Plaintiff, as a shareholder and a representative of Domino's Pizza, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

116.    Plaintiff on behalf of Domino's Pizza has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants for Waste of Corporate Assets**

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

119.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

120.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

121.   Plaintiff, on behalf Domino's Pizza, has no adequate remedy at law.

<u>**COUNT V**</u>

**Against Individual Defendants Reddy and Weiner for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

122.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.   Domino's Pizza and Individual Defendants Reddy and Weiner are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Individual Defendants Reddy's and Weiner's willful and/or reckless violations of their obligations as officers and/or directors of Domino's Pizza.

124.   Defendants Reddy and Weiner, because of their positions of control and authority as officers and/or directors of Domino's Pizza, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Domino's Pizza, including the wrongful acts complained of herein and in the Securities Class Action.

125.     Accordingly, Defendants Reddy and Weiner are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

126.     As such, Domino's Pizza is entitled to receive all appropriate contribution or indemnification from Defendants Reddy and Weiner.

127.     Plaintiff, on behalf Domino's Pizza, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

•     strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

      •      strengthening the Company's internal reporting and financial disclosure controls;

      •      developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

      •      strengthening the Board's internal operational control functions;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2025

**FINK BRESSACK**

By:   */s/ David H. Fink*
         David H. Fink (P28235)
         Nathan J. Fink (P75185)
         *Attorneys for Plaintiff*
         38500 Woodward Avenue, Suite 350
         Bloomfield Hills, MI 48304
         Telephone: (248) 971-2500
         dfink@finkbressack.com
         nfink@finkbressack.com

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Gina M. Serra (application for
admission to be submitted)
*Attorneys for Plaintiff*
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
tjm@rl-legal.com
gms@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar (application for
admission to be submitted)
*Attorneys for Plaintiff*
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

## <u>VERIFICATION</u>

I, DARAN JOSHI, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Domino's Pizza, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 3/11/2025

DARAN JOSHI